UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE ACUTUS MEDICAL, INC. SECURITIES LITIGATION | Case No.: 22-cv-206-RSH-DDL<br>**ORDER GRANTING MOTION TO DISMISS**<br>[ECF No. 32] |

Pending is a motion to dismiss for failure to state a claim filed by Defendants Acutus Medical, Inc. ("Acutus"), Vince Burgess, and David H. Roman (collectively "Defendants"). ECF No. 32. As set forth below, the Court grants the motion.

## I. BACKGROUND

Lead Plaintiff Paul Weinberg brings this securities fraud putative class action on behalf of "persons and entities that purchased or acquired Acutus Medical, Inc. common stock between May 13, 2021 and November 11, 2021, inclusive (the 'Class Period')." ECF No. 27 (Amended Consolidated Class Action Complaint ("CAC" or "Complaint")) ¶ 1. In short, this lawsuit seeks redress for Acutus investors who lost money "as a result of Defendants' material misrepresentations about the progress of commercial execution for

their flagship product, a heart mapping device called the AcQMap System." ECF No. 33 at 1. The Complaint alleges as follows.

Defendant Acutus is incorporated in Delaware and headquartered in Carlsbad, California. CAC ¶ 25. Defendant Burgess served as Acutus's President and Chief Executive Officer ("CEO") from October 2017 and throughout the Class Period, and as a Director of Acutus from June 2013 and throughout the Class Period. *Id.* ¶ 26. Defendant Roman served as Acutus's Chief Financial Officer ("CFO") from February 2021 and throughout the Class Period. *Id.* ¶ 27.

Acutus "designs, manufactures, and markets products used in cardiac ablation procedures." *Id.* ¶ 2. Cardiac ablation is a procedure to treat an irregular heartbeat, known as cardiac arrhythmia, by destroying small portions of heart tissue. *Id.* ¶¶ 30-31. To perform such a procedure, a medical provider makes an incision in the groin to gain access to the heart and then inserts a diagnostic catheter. *Id.* ¶ 3. To be effective, this procedure requires mapping of the heart and relevant blood vessels. Mapping systems currently on the market "collect data through contact with the heart chamber wall and create a map of the heart and the electrical activation pathways." *Id.* Acutus "sought to create a paradigm shift" in offering its "AcQMap" heart mapping system, which "purports to shorten mapping times and improve precision compared to currently marketed products, allowing it to more quickly and accurately diagnose the sources and maintainers of arrhythmias." *Id.* ¶ 5. Unlike current standard of care products, the AcQMap System is non-contact-based, meaning that the mapping instrument does not touch the heart chamber wall. *Id.*

Acutus generates revenue through the sale of its AcQMap System as well as through the sale of disposable products used with the system. In some cases, Acutus installs AcQMap Systems through "evaluation agreements" with no upfront fee to the customer, in exchange for the customer's commitment to purchase Acutus's disposable products during a three-to-twelve-month evaluation period. *Id.* ¶¶ 7, 43. During this evaluation period, Acutus tries to reach an agreement with the customer to purchase the AcQMap System. *Id.* ¶ 43. Acutus's "growth strategy" is focused on increasing physician utilization

and its "installed base," which is the number of AcQMap Systems placed at customer sites globally. *Id.* ¶¶ 8, 9.

Acutus began to place early versions of the AcQMap System in a limited pilot launch in July 2016, and made its full-scale commercial launch of the system in the first quarter of 2020. *Id.* ¶ 6. Acutus conducted its initial public offering in August 2020. *Id.* ¶ 10.

### A. Chronology

The Complaint alleges fraud in connection with a series of statements made by Defendants in 2021: (1) a press release on May 12, 2021 announcing Acutus's results for Q1 (the "Q1 2021 Press Release"); (2) a public conference call held that same day (the "Q1 2021 Call"); (3) a call held the following day at a global healthcare conference (the "May 13, 2021 Call"); (4) secondary public offering materials filed with the Securities and Exchange Commission ("SEC") in July 2021 (the "SPO Materials"); (5) a press release on August 12, 2021 regarding Q2 2021 (the "Q2 2021 Press Release"); and (6) a public conference call held that same day (the "Q2 2021 Call").

Broadly speaking, Plaintiff alleges two types of misrepresentations made during the communications above. First, "Defendants claimed Acutus's commercial execution had improved and was improving when in fact, it had not improved and was declining." ECF No. 33 at 2. Second, "there was no reasonable basis for Defendants to claim they could achieve their stated objectives of placing at least 12 new systems per quarter and earning $22 to $30 million in revenue in fiscal year 2021." *Id.*

The Parties identify additional Acutus statements made before and after the communications at issue—either statements alleged in the Complaint, or subject to judicial notice—as pertinent to the allegations here. In particular, Defendants identify statements in which Acutus disclosed weaknesses with its commercial execution, as well as ongoing challenges and risks relating to the COVID-19 pandemic and related hospital restrictions, resulting (for example) in fewer procedures and diminished access to physicians. The Court sets forth the relevant chronology below, indicating with bold italics statements that the Complaint alleges were false or misleading.

**1. March 18, 2021: Earnings Call**

Acutus's first full quarter as a public company was Q4 2020. During a March 18, 2021 earnings call, Burgess discussed Acutus's results from that quarter. Burgess reported that during the quarter, the company had increased its installed base of AcQMap consoles from 49 to 58. ECF No. 32-13, Ex. 9 at 5.[1] He noted "COVID-related headwinds" persisting through early Q1 2021, but stated "we have started to see case volumes pick up in recent weeks" and "we are cautiously optimistic that the trends will continue to improve." *Id.* Burgess noted, however, that "we have not achieved our goals in the U.S." *Id.* at 6. He explained:

> Despite hiring some of the absolute best and brightest from the electrophysiology community into our commercial organization, we have been slow with the initiation of some of our installs and struggled to drive uptake and consistent utilization.
>
> COVID has, no doubt, layered significant challenges for a new-to-market, early-stage company like ours. However, it is my view that there are other execution factors at play here, primarily related to inadequate targeting, physician segmentation and proper training and direction of our commercial team.

*Id*. at 6. Burgess further stated, "we've got to make sure that these systems that get placed are placed into the hands of physicians and teams at hospitals that are deeply committed to … really working with us," and "there is work to be done there." *Id.* at 10. He added that "we were just understaffing our initial site install and launch," *id.*, and that "we have been a bit slow … in really tuning up our own commercial and clinical teams," *id*. at 14. To try to correct these issues, Acutus "executed on a plan to pull every single one of our

---

[1] Defendants requested judicial notice of Exhibits 1-12. ECF No. 32-2. Plaintiff does not oppose Defendants' request "to the extent the Court takes notice of the fact that the documents exist and what they say." ECF No. 33 at 4 n.2. The Court grants Defendants' request and takes judicial notice of the existence and statements contained in the exhibits because they are incorporated by reference in the operative complaint.

commercial people in the U.S. out of the field" in order "to train and retrain" them, *id.* at 15, and hired a new Chief Commercial Officer, *id.* at 6.

**2. March 19, 2021: Acutus's 2020 Form 10-K**

Acutus filed its 2020 Form 10-K with the SEC on March 19, 2021. The Form 10-K began its "Risk Factors" section with the statement: "We have a limited history operating as a commercial company; if we fail to effectively train our sales force, increase our sales and marketing capabilities or develop broad brand awareness in a cost-effective manner, our growth will be impeded and our business will suffer." ECF No. 32-5, Ex. 1 at 18. Among others, the Form 10-K advised that doctors and hospitals "may not adopt our products … unless they are able to determine, based on experience, clinical data, medical society recommendations and other analyses" that the company's products are safe, effective, and cost-effective. *Id.* at 19. The Form 10-K further stated that "even if we are able to raise awareness, physicians tend to be slow in changing their medical treatment practices and may be hesitant to select [Acutus's] products for recommendation to their hospitals or patients for a variety of reasons, including … [the] time commitment and skill development that may be required to gain familiarity and proficiency with our products." *Id.*

The 2020 Form 10-K explained that the COVID-19 pandemic and the measures imposed to contain it "disrupted and are expected to continue to impact our business." *Id.* at 27. For example, "access to hospitals and other customer sites was restricted to essential personnel, which has negatively impacted our ability to install our AcQMap consoles and workstations in new customer accounts and for our sales representatives and mappers to promote the use of our products with physicians." *Id.* Additionally, "hospitals and other therapeutic centers suspended many elective procedures, resulting in a significantly reduced volume of procedures using our products." *Id.* The Form 10-K stated, "[w]e cannot assure you that we will not experience similar, or even more sustained, access restrictions or decreases in procedural activities as hospitals continue to deal with the COVID-19 pandemic." *Id.* at 28.

**3. May 12, 2021: Q1 2021 Press Release**

After the close of trading on May 12, 2021, Acutus issued its Q1 2021 Press Release. ECF No. 32-15, Ex. 11; CAC ¶ 105. The release reported an increase in revenue, as well as an increase in the total installed base of AcQMap consoles to 62 (from 58 at the end of the previous quarter). ECF No. 32-15, Ex. 11 at 2. The release quoted Burgess, stating, "We are pleased with the ***progress*** on several key strategic initiatives, including improved revenue performance and ***commercial execution*** …." *Id*. at 2; CAC ¶ 106. He also stated, "In the US, we are encouraged to see this part of our business ***gaining momentum*** as end-markets improve." ECF No. 32-15, Ex. 11 at 2; CAC ¶ 106.

The release noted continued uncertainty relating to COVID-19, and stated that management "anticipates continued regional headwinds in 2021, particularly in the first half of the year." ECF No. 32-15, Ex. 11 at 2. The release stated that for the full year of 2021, "management continues to expect revenue to range between $22.0 million and $30.0 million." *Id.* at 3-4.[2]

**4. May 12, 2021: Q1 2021 Call**

The same day, the company held its Q1 2021 Call. *See* ECF No. 32-8, Ex. 4. At the outset of the call, the company advised that the call "will include forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, and that "[a]ll statements made on this call that do not relate to matters of historical fact should be considered forward-looking statements." *Id.* at 2. The company also stated at the outset that "[f]actors that may cause results to differ from these forward-looking statements" were discussed in the company's press release and in its SEC filings, including the risk factors described in its Form 10-K. *Id.*[3]

---

[2] The record here does not reflect when Acutus's management first provided this revenue guidance for 2021.

[3] The company's Q2 and Q3 2021 Calls began with the same advisals. *See* ECF No. 32-10, Ex. 6 at 2; ECF No. 32-12, Ex. 8 at 2.

On the call, Burgess reported the increase in the installed base. CAC ¶ 109. He stated that the U.S. commercial team was "***executing on our plan for more rigorous account segmentation, ensuring the right physician training and engagement and driving growth and utilization***." *Id.* ¶¶ 107-08. Burgess further stated, "Our ***commercial execution globally*** is ***strengthening***, and I'm ***confident*** we have ***the right team in place***." *Id.* ¶¶ 111-12. Roman stated, "we continue **to *project full year revenue to be in a range of $22 million to $30 million***" and "we continue to ***expect improved commercial execution in the U.S. to be a major driver.***" *Id.* ¶¶ 113-14.

In discussing the pace of installations during Q1 and in April 2021, Burgess noted the company's need to "move a few consoles around" to ensure that they were placed with physicians who would use them:

> I kind of had the sense that we would probably move a few consoles around [in Q1 2021], and it might be a little bit lighter than the rest of the year in terms of placements. And then as we came into Q2, things would start to ramp up again…. I think our net new adds in April alone in terms of installed base equal to Q1. So I think we're ***on track*** now. Just ***Q1 was just a little light,*** almost intentionally. We really ***wanted to make sure everything we installed was in the right place, the expectations were set properly, and we have the right docs identified.***

*Id.* ¶¶ 115-16.

Burgess noted continuing challenges due to COVID-19, stating that "installations were delayed due to COVID, and there is concentration in markets like Germany where elective procedures have largely been on hold." *Id.* ¶ 111. In response to a question about projections of utilization, Burgess answered, "In Europe, over half of our consoles basically have been down in all of Q1 due to – 100% due to COVID." *Id.* ¶ 117.

**5. May 13, 2021 Call and Start of Class Period**

The following day, on May 13, 2021, the company filed its Form 10-Q for Q1 2021 with the SEC ("Q1 2021 10-Q"). ECF No. 32-7, Ex. 3. The Q1 2021 10-Q addressed,

among other things, the impact of COVID-19, *id.* at 5, and also incorporated the statement of Risk Factors contained in the Form 10-K filed earlier that year, *id.* at 38.[4]

The following day, Acutus participated in the May 13, 2021 Call, at the Bank of America Global Research Healthcare Conference. ECF No. 32-14, Ex. 10. On the call, Roman stated that of the 62 consoles in the field, 16 "have been converted to capital sales or some type [of] catheter deal." *Id.* at 5. He added, "[s]o we have a large pool of opportunity as the valuations come up for agreement for – to completion." *Id.*

In response to a question about what would be a "reasonable" baseline of console placements Acutus could "deliver per quarter going forward," Burgess stated, "I mean, I think a reasonable pace for us to expect and to execute on globally is ***about four a month or 12 a quarter globally***." *Id.* at 6; CAC ¶¶ 131-32. Burgess later added, "I would say that the 4 a month are systems which we put into service under some agreement…. And again, this is an average. It's not going to be exactly 4 a month, every month, but we think that is the general cadence that we can and want to achieve." ECF No. 32-14, Ex. 10 at 6.

**6. July 12 and 15, 2021: SPO Materials**

In July 2021, Acutus conducted its secondary public offering ("SPO") and raised $88.6 million in gross proceeds. CAC ¶ 73. In the Prospectus filed with the SEC on July 15, 2021, the company stated, "[w]e have taken and continue to take a ***measured approach to account targeting and physician training***. We have assembled a team with an in-depth knowledge of the target markets in which we compete and seek to compete." ECF No. 32-6, Ex. 2 at 90; CAC ¶¶ 138-39.

**7. August 12, 2021: Q2 2021 Press Release**

After the market closed on August 12, 2021, the company issued its Q2 2021 Press Release"). CAC ¶ 74. The release stated, "the Company continues to ***make progress*** with

---

[4] The subsequently filed Q2 and Q3 2021 Form 10-Qs likewise incorporated by reference the Form 10-K filed on March 19, 2021. ECF No. 32-9, Ex. 5; ECF No. 32-11, Ex. 7.

key growth initiatives, including ***strengthening commercial execution***. For the full year, management is leaving its guidance unchanged and projects revenue to ***range between $22.0 million and $30.0 million***." *Id.* ¶¶ 152-53.

**8. August 12, 2021: Q2 2021 Call**

On the same day, the company held its Q2 2021 Call. ECF No. 32-10, Ex. 6. Burgess reported that during the quarter it had increased its total installed base of consoles to 70, up from 62 at the end of the last quarter. *Id.* at 4. Roman stated that "we are maintaining our guidance range and expect revenue to be in a range of ***$22 to $30 million***." CAC ¶¶ 158-59. He noted, however, that "[t]he lower end of our guidance range requires a similar improvement in the second half of the year as to what we have seen on a year-to-date basis." *Id.* ¶ 158. That improvement had depended on factors including "new account openings, increased same-store utilization" and "moderating but still present COVID headwinds." *Id*. The company further stated that "[i]n the UK and Europe, COVID continued to affect our business throughout the second quarter," and "COVID infection rates have been rising across the US." ECF No. 32-10, Ex. 6 at 5.

Reflecting on the cadence of performance in the first half of the year, Burgess stated, "[o]ur commercial execution globally is ***strengthening***, and I am confident we ***have the right team in place***." CAC ¶¶ 154-55. Burgess stated that Acutus had increased the installed base by a net of eight systems. ECF No. 32-10, Ex. 6 at 13; CAC ¶¶ 75, 166. In response to a question about the company's confidence in achieving their guidance, Burgess stated, "the team is ***figuring out the formula here for driving installs, driving utilization, driving engagement with our docs***." CAC ¶¶ 162-63.

Roman stated, with regard to "the strategy around identifying productive accounts and moving systems around," that "we are actively doing that." ECF No. 32-10, Ex. 6 at 12; CAC ¶ 166. He explained, "[t]here is very little value to us and actually anyone in the ecosystem, physician, patient or us having a system in a site that doesn't make sense." ECF No. 32-10, Ex. 6 at 12; CAC ¶ 166. Roman stated that this could be "the result of the physician champion [who] has left," or "a result of the fact that we quite frankly in our

early commercial launch did not pick the right accounts into which to install these systems," among "a variety of other factors." ECF No. 32-10, Ex. 6 at 12-13; CAC ¶ 166. He added, "we will look to move systems around, bring them back here, upgrade them and redeploy them into the field." ECF No. 32-10, Ex. 6 at 13; CAC ¶ 166. He noted, "we will probably have ***some*** removals here in the back half of the year." ECF No. 32-10, Ex. 6 at 13; CAC ¶¶ 166-67.

Acutus's stock price dropped from $13.29 to $11.56 the next day. CAC ¶ 80.

**9. November 11, 2021: Q3 2021 Call and End of Class Period**

On November 11, 2021, during the company's Q3 2021 Call, Burgess advised that the company had increased its installed base to 71, a net addition of only one console over the course of the quarter. ECF No. 32-12, Ex. 8 at 4. Burgess explained, "[i]n the US, we saw COVID-related shutdowns in several parts of the country, including Arizona, Florida and Nevada, where we happened to have a high concentration of mapping and left heart access customers," while "[i]n Europe, we saw extended cath lab shutdowns, partly due to managing COVID risks as well as longer than usual v[a]cations." *Id.* He also stated that "[d]uring the quarter, we made the strategic decision to remove and reposition certain systems with below target utilization or where key physician users had relocated to a new geography." *Id.*; CAC ¶ 82. Burgess elaborated that the company removed or repositioned:

> less than 10, but still a meaningful number of consoles that were already in place, because the doctor or champion maybe had moved geography or we just weren't seeing the kind of traction we wanted to, or maybe we had the wrong commercial team on the ground or an insufficient commercial team on the ground.

ECF No. 32-12, Ex. 8 at 9; CAC ¶ 82.

Roman announced that the company "expect[ed] revenue to be in a range of $17 million to $17.5 million." ECF No. 32-12, Ex. 8 at 7; CAC ¶ 81. Roman stated, "[w]e had assumed in our initial guidance that COVID-related headwinds would dissipate throughout the year," but instead "we have seen ongoing waves of COVID disruptions and recoveries." ECF No. 32-12, Ex. 8 at 6. In addition, "[w]ith the revamped strategy earlier this year, we

had planned for a more rapid improvement in execution" than Acutus had actually realized, and that shortfall was "one of the major drivers included in our updated guidance." *Id*.

Acutus's stock price dropped from $6.66 to $3.64 the next day. CAC ¶ 87.

### B. Procedural History

On February 15, 2022, Plaintiff Jeffry Brown filed a putative class action complaint against Defendants. ECF No. 1. On July 17, 2022, the Court consolidated *Jeffry Brown v. Acutus Medical, Inc., et al.*, No. 22-cv-206, and *Clinton A. Ferguson v. Acutus Medical, Inc., et al.*, No. 22-cv-388. ECF No. 21. The Court also appointed Paul D. Weinberg to serve as Lead Plaintiff. *Id*. On September 16, 2022, Lead Plaintiff Weinberg filed the operative Amended Consolidated Class Action Complaint. *See generally* CAC.

Plaintiff asserts two claims for violations of the Securities Exchange Act of 1934 ("Exchange Act"). The first claim asserts a violation of Section 10(b) of the Exchange Act and Rule 10b-5 against all Defendants. *Id.* at p. 101-04. The second claim asserts a violation of Section 20(a) of the Exchange Act against Defendants Burgess and Roman ("Individual Defendants"). *Id.* at p. 104-05. Plaintiff seeks damages, costs, and fees. *Id.* at p. 105.

On November 15, 2022, Defendants filed a motion to dismiss for failure to state a claim. ECF No. 32. The motion has been fully briefed. ECF Nos. 33–34.

## II. LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). To survive a 12(b)(6) motion, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court "disregard[s] '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'" *Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1003 (9th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009)). "After eliminating such unsupported legal conclusions, we identify 'well-pleaded factual allegations,' which we assume to be true, 'and then determine whether they plausibly give rise to an entitlement to relief.'" *Id.*

For securities fraud claims, a plaintiff "must meet the higher, exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (PSLRA)." *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313–14 (2007)). Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Pursuant to Rule 9(b), "[t]he complaint must specify such facts as the times, dates, places, benefits received, and other details of the alleged fraudulent activity." *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993).

## III. DISCUSSION

### A. Section 10(b) of the Exchange Act

Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange … any manipulative or deceptive device or contrivance …." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 413 (9th Cir. 2020) (citing 15 U.S.C. § 78j(b)). Rule 10b-5 was promulgated and provides that it is unlawful for any person "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Id.* (citing 17 C.F.R. § 240.10b-5). To plead a claim under Section 10(b) of the Exchange Act and Rule 10b-5, Plaintiff must allege the following elements:

> [1] a material misrepresentation or omission;
>
> [2] scienter, *i.e.*, a wrongful state of mind;
>
> [3] a connection with the purchase or sale of a security;
>
> [4] reliance;
>
> [5] economic loss; and
>
> [6] loss causation, *i.e.*, a causal connection between the material misrepresentation and the loss[.]

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005) (numbering and formatting added for reference). "Rule 9(b) applies to all elements of a securities fraud action, including loss causation." *Apollo Group*, 774 F.3d at 605. In moving to dismiss, Defendants challenge whether Plaintiff has sufficiently pleaded a material misrepresentation or omission (first element), scienter (second element), and loss causation (sixth element). As such, the Court addresses each disputed element in turn.

**B. Material Misrepresentation or Omission**

To allege a material misrepresentation or omission under Rule 10b-5, a plaintiff may plead either an affirmative misrepresentation theory or an omission theory. *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1188 (9th Cir. 2021) (citing 17 C.F.R. § 240.10b-5(b)). "An affirmative misrepresentation is an untrue statement of a material fact," while a "fraudulent omission is a failure to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Id.* (internal quotations omitted). To be actionable under the securities laws, statements "must be both false or misleading and material." *Lopes v. Fitbit, Inc.*, No. 18-CV-06665-JST, 2020 WL 1465932, at *3 (N.D. Cal. Mar. 23, 2020), *aff'd*, 848 F. App'x 278 (9th Cir. 2021).

A plaintiff pleads falsity when the complaint points to a "defendant's statements that directly contradict what the defendant knew at that time." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018). On the other hand, an omission or statement is misleading if it "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002); *see also In re Cutera Sec. Litig.*, 610 F.3d 1103, 1109 (9th Cir. 2010) (citing *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008)).

To plead materiality, a plaintiff must (1) specify each allegedly misleading statement or omission, and (2) explain why the statement is misleading. 15 U.S.C. § 78u-4(b)(1)(B). To satisfy the materiality requirement, there must be "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*,

485 U.S. 224, 231–32 (1976) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

Defendants' motion to dismiss argues, as an initial matter, that the Complaint largely reproduces wholesale the Defendants' public statements during the Class Period, but "fails to allege any false or misleading statements." ECF No. 32-1 at 16. In his Opposition, Plaintiff responds that he does indeed "allege[] materially false and misleading statements and omissions." ECF No. 33 at 13. But Plaintiff does not proceed to identify them. The closest Plaintiff comes is the following passage, citing paragraphs of the Complaint:

> Throughout the Class Period, Defendants represented to investors that Acutus's commercial execution, especially in the U.S., had improved and was continuing to improve, due to their focus on hiring the right people, better account targeting, and "ensuring the right physician training and engagement (*e.g.*, ¶¶ 57, 58, 61). Indeed, Defendants stated that Acutus's commercial execution in the U.S. was a "major driver" of their ambitious yearly revenue guidance of $22 million to $30 million (¶ 113).

*Id*. at 14.

All the paragraphs in the Complaint cited by Plaintiff above relate to statements made on the Q1 2021 Call. The first, by Burgess, is as follows:

> As for the U.S., we are seeing improved momentum in this business. Our new Chief Commercial Officer, Duane Wilder, who joined us in March is providing great leadership direction and a disciplined go-to-market strategy. We are ***executing on our plan*** for more rigorous account segmentation, ensuring the right physical training and engagement and ***driving growth and utilization***.

CAC ¶ 57.[5] The Complaint alleges that Acutus was not "executing on [its] plan" nor did it have such a "plan" for more rigorous account segmentation; and that Acutus was not "driving growth and utilization" because a substantial number of AcQMap systems were

---

[5] As explained *supra*, the emphasis added here pertains to those portions of the passage that the Complaint alleges were false or misleading.

placed pursuant to research agreements whereby Acutus paid physicians to use the systems. *Id.* ¶ 108.

Second, Burgess stated on the call that "many of the new system placements so far in 2021 are at major academic and high-volume community institutions, ***consistent with our strategy to be more targeted*** with capital placements." *Id.* ¶ 58. The Complaint alleges that Acutus's strategy was not in fact "targeted." *Id.* ¶ 110.

Third, Roman stated on the call:

> Based on current trends and planned internal initiatives, ***we continue to anticipate a more meaningful step-up*** in Q3 and Q4 ….
>
> On our last earnings call, we outlined 5 key factors to support this growth throughout the year, and I'd like to give you an update on each of these drivers. The first is the timing of capital sales and conversions. We have several evaluations that are reaching completion. ***Our teams are working to convert these into capital sales or catheter utilization deals*** ….
>
> Lastly, ***we continue to expect improved commercial execution in the U.S. to be a major driver***. We are strengthening and expanding our team, investing in critical training resources and ensuring we have the right level of account coverage.

*Id.* ¶ 61. The Complaint alleges that Defendants did not have a reasonable basis to "anticipate a more meaningful step-up" or "to expect improved commercial execution in the U.S. to be a major driver," and were not working to "convert these into capital sales leases or catheter utilization deals." *Id.* ¶ 114.

The statements identified above, as well as similar misrepresentations alleged in the Complaint, do not adequately allege actionable misrepresentations. Indeed, some of Plaintiff's allegations fail at the outset because they are implausibly alleged. The Complaint's allegation that Acutus did not have a "plan" as of the Q1 2021 Call (May 12, 2021) is belied by Roman's statement from the previous quarterly call, before the Class Period began, discussing the company's plan to improve commercial execution. ECF No. 32-13, Ex. 9. Likewise, the Complaint's allegation that Defendants misled investors by

referring to "our strategy to be more targeted" seemingly suggests that Defendants instead had the strategy of not being targeted at all. The Complaint's allegation that the company was not in fact "working" to convert AcQMap system placements into revenue implies the company was literally doing nothing. These allegations are not plausibly alleged given the company's discussion of its plans and strategies.[6]

Additionally, the statements at issue are non-actionable, either as a result of being vague in nature, or as a result of the safe harbor for forward-looking statements.

***1. Vague Statements and Puffery***

"Puffing" is distinct from misrepresentation. "'Puffing' concerns expressions of opinion, as opposed to knowingly false statements of fact." *Apollo Group*, 774 F.3d at 606. "When valuing corporations,[] investors do not rely on vague statements of optimism like good, well-regarded, or other feel good monikers." *Id.* (internal quotations omitted) (quoting *In re Cutera Sec. Litig.*, 610 F.3d at 1111). On the other hand, "[s]tatements by a company that are capable of objective verification are not 'puffery' and can constitute material misrepresentations." *Id.* Naturally, "[t]he context in which the statements were made is key." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014).

In *Apollo Group*, the Ninth Circuit found the following statement to be an example of non-actionable puffing:

> We believe that our track record for enrollment and revenue growth is

---

[6] The same analysis applies to similar statements that the Complaint alleges were false or misleading: "Our teams are *working to convert these into capital sales leases or catheter utilization deals*" CAC ¶¶ 113-14; "And number 2, it's really about targeting, and when I say *targeting*, the place for us to go is centers where there are one or more physicians who aren't satisfied with their current procedural technique for persistence, for redos, for tachycardias and are *ready, willing and able* to think about modifying their workflow …." *id.* ¶¶ 119-20; "Although we are attempting to increase our installed base through our established relationships and *focused sales efforts*, we cannot provide assurance that our efforts will be successful." *id.* ¶¶ 127-28; "[T]he team is *figuring out the formula here for driving installs, driving utilization, driving engagement with our docs*." *id.* ¶¶ 162-63.

> attributable to our offering comprehensive services combining quality educational content, teaching resources and customers service with formats that are accessible and easy to use for students as well as our corporate clients.

*Apollo Group*, 774 F.3d at 606. The plaintiffs in that case argued that the statement misled consumers as to the company's enrollment and revenue growth ("our track record for enrollment and revenue growth"), and as to the company's business model and recruitment of students. *Id.* at 605-06. The Ninth Circuit determined that the company's statement was vague, and "provided nothing concrete" on which investors could rely. *Id.* at 606. Distinguishing cases cited by the plaintiff in that case, the Ninth Circuit stated that "[u]nlike accounting calculations or ignorance of rule violations, the statements by Apollo were subjective and preceded by qualifiers, such as 'We believe.'" *Id.* at 607.

The statements identified by Plaintiff here are likewise too vague to be actionable. In context, Defendants' statements that the company was "executing on our plan," "driving growth and utilization," and had a "strategy to be more targeted" provide nothing concrete on which an investor would rely. Similarly, Defendants' statements that "we continue to anticipate a more meaningful step-up" and "we continue to expect improved commercial execution in the U.S. to be a major driver" are, in context, vague and optimistic statements of opinion. *See Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1245 (N.D. Cal. 1998) ("Vague, amorphous statements are not actionable because reasonable investors do not consider 'soft' statements or loose predictions important in making investment decisions.").[7]

In context, the same goes for other alleged misrepresentations in the Complaint that Plaintiff does not address in the argument in his Opposition. These include highly generalized statements about progress, strengthening, or gaining momentum. *See* CAC

---

[7] The same analysis applies to similar statements that the Complaint alleges were false or misleading: "I would say the U.S. is a bit more of a *mixed bag*." CAC ¶¶ 117-18; and "We will probably have *some* removals here in the back half of the year." *id.* ¶¶ 166-67.

¶¶ 105-06 (“We are pleased with the ***progress*** on several key strategic initiatives, including improved revenue performance and ***commercial execution***…. In the US, we are encouraged to see this part of our business ***gaining momentum*** as end-markets improve.”); ¶¶ 111-12 (“Our ***commercial execution globally*** is ***strengthening***, and I’m ***confident*** we have the ***right team*** in place.”); ¶¶ 115-16 (“So I think we’re ***on track*** now.”); ¶¶ 152-53 (“[T]he Company continues to make progress with key growth initiatives, including ***strengthening commercial execution***.”); ¶¶ 154-55 (“Our commercial execution globally is ***strengthening***, and I am confident we have the ***right team*** in place.”).

Similar statements regarding assessments of a company or expressions of confidence have been held to constitute nonactionable puffery. *See City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1064 (N.D. Cal. 2012) (“strong demand metrics and good momentum” and “growth drivers give us … confidence”); *In re Mellanox Techs., Ltd. Sec. Litig.*, No. 13-CV-04909-JD, 2014 WL 7204864, at *2 (N.D. Cal. Dec. 17, 2014) (customers “are growing,” usage of the company’s products which is “just growing,” and “growing” number of applications and datacenters); *Hertz Corp. v. Accenture LLP*, No. 19cv3508, 2019 WL 5537997, at *5 (S.D.N.Y. Oct. 25, 2019) (company will “put the right team on the ground [on] day one”); *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1168 (C.D. Cal. 2007) (“continuing to gain ground … putting us on track to meet our sales estimates for December” and “on track to deliver improved financial performance in the fall, in line with our turnaround plan” amounted to mere corporate puffery); *In re Dot Hill Sys. Corp. Sec. Litig.*, 594 F. Supp. 2d 1150, 1158 (S.D. Cal. 2008) (technology integration was “on schedule and continuing smoothly”); *In re Cornerstone Propane Partners, L.P.*, 355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005) (“‘measurable progress’ … constitute[s] [a] vague, unspecific assertion[] of corporate

optimism"); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1077 (N.D. Cal. 2001) ("strong," "robust," "well positioned," "solid," and "improved").[8]

The statements at issue must also be considered in light of the Defendants' ongoing disclosures of the challenges associated with its commercial execution, including specific challenges relating to the pandemic. In addition to the risks and disruptions identified in the company's SEC filings during 2021, the company made disclosures on calls just before and during the Class Period. *See, e.g.*, ECF No. 32-13, Ex. 9 (Tr. of Mar. 18, 2021 Call), at 6 ("[W]e have not achieved our goals in the U.S."); *id.* at 10 ("[T]here is work to be done there."); *id.* at 14 ("[W]e have been a bit slow . . . in really tuning up our own commercial and clinical teams and getting them in a position to educate some of these physicians …."); CAC (quoting Q1 2021 Call on May 12, 2021) ¶ 111 ("While installations were delayed due to COVID, and there is concentration in markets like Germany where elective procedures have largely been on hold, we are starting to see improvements."); *id.* ¶ 117 ("In Europe, over half of our consoles basically have been down in all of Q1 due to – 100% due to COVID."); ECF No. 32-10, Ex. 6 (Tr. of Q2 2021 Call on Aug. 12, 2021), at 5 ("In the UK and Europe, COVID continued to affect our business throughout the second quarter," and "COVID infection rates have been rising across the US."); *id.* at 12 (referring to "moving systems around"); *id.* at 12-13 (explaining that underutilization could be "the

---

[8] The same analysis applies to similar statements that the Complaint alleges were false or misleading: "*Q1 was just a little light*, almost intentionally. We really *wanted to make sure everything we installed was in the right place, the expectations were set properly, and we have the right docs identified*." CAC ¶¶ 115-16; "We plan to *leverage the geographically concentrated nature of procedure volumes* and the recurring nature of our sales to drive an *increasingly efficient commercial model*." *id.* ¶¶ 123-24, 138-39, 143-44, 169-70; "We believe our installed base is one of the *key indicators* of our *ability to drive customer adoption of our products* …." *id.* ¶¶ 125-26; "[O]ur commercial organization consisted of 88 individuals with *substantial applicable medical device, sales and clinical experience* …." *id.* ¶¶ 127-28; "We have taken and continue to take a *measured approach to account targeting and physician training*." *id.* ¶¶ 138-39; "But our focus is really on *finding the absolute right accounts*." *id.* ¶¶ 166-67.

result of the physician champion [who] has left," or "a result of the fact that we quite frankly in our early commercial launch did not pick the right accounts into which to install these systems"). The contents of the challenged statements, in the context of disclosures consistently made by the company during the relevant time period, reflect vague optimism but nothing more.

### 2. *Forward-Looking Statements*

The PSLRA carves out a "safe harbor for forward-looking statements" by adding § 21E to the Securities Exchange Act. 15 U.S.C. § 78u-5 (heading); *Tesla*, 985 F.3d at 1190. These statements include "(1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues." *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003) (citing 15 U.S.C. § 78u–5(i)).

The safe harbor applies where the forward-looking statement is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i). This safe harbor "is designed to protect companies and their officials" when they merely fall short of their "optimistic projections." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017). The "bespeaks caution" doctrine similarly protects defendants from liability for forward-looking statements accompanied by cautionary language. *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 798 (9th Cir. 2017).

Some of the statements in the Q1 2021 Call that Plaintiff identifies as misrepresentations—including that Defendants "anticipate a more meaningful step-up" or "expect improved commercial execution in the U.S. to be a major driver," are explicitly forward-looking in nature. *See Weston v. DocuSign, Inc.*, No. 22-CV-00824-WHO, 2023 WL 3000583, at *14 (N.D. Cal. Apr. 18, 2023) ("we don't anticipate customers returning to paper or manual-based processes" is forward-looking); *In re Pivotal Sec. Litig.*, No.

3:19-CV-03589-CRB, 2020 WL 4193384, at *15 (N.D. Cal. July 21, 2020) ("we're expecting [our net expansion rate] to come down" and "we expect to see continued growth in these very large accounts as they seek to modernize the applications that run their businesses" were forward-looking statements). So is Burgess's statement, "I mean, I think a reasonable pace for us to expect … is about four a month or 12 [installations] a quarter globally …. It's not going to be exactly 4 a month, every month, but we think that is the general cadence that we can and want to achieve[.]" CAC ¶ 131. *See* 15 U.S.C. § 78u-5(i)(1)(B) (defining "forward-looking statement" as including "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer"); *Tesla*, 985 F.3d at 1192 (holding that Tesla's goal to produce 5,000 vehicles per week is "unquestionably" a forward-looking statement because it is a "plan" or "objective[] of management for future operations"). The same applies to Roman's statement that "we continue to project full year revenue to be in a range of $22 million to $30 million." CAC ¶ 113. *See* 15 U.S.C. § 78u–5(i)(1)(A) (defining "forward-looking statement" as including "a statement containing a projection of revenues").

Defendants' statements were paired with meaningful cautionary language. At the outset of the call, the company explained that the call would include "forward-looking statements," encompassing all statements made "that do not relate to matters of historical fact," and referred to the company's press release filed with the same day, as well as the risk factors set forth in the company's Form 10-K. ECF No. 32-8, Ex. 4 at 2. The press release provided further context to the meaning of "forward-looking" statements. ECF No. 32-15, Ex. 11. The press release also described factors that could cause actual results to differ from the forward-looking statements, including "the effect of global economic conditions on the ability and willingness of customers to purchase the Company's systems and the timing of such purchases, competitive factors, changes resulting from healthcare policy in the United States … the impact of the coronavirus (COVID-19) pandemic and Acutus's response to it, and other risks discussed in the Company's periodic and other

filings with the Securities and Exchange Commission." *Id.* Accordingly, Defendants' forward-looking statements were accompanied by meaningful cautionary statements that have been found by courts to be sufficient. *See Fitbit*, 2020 WL 1465932, at *8 (finding sufficient Fitbit's cautionary statements because "[e]ach press release and call discussing Fitbit's guidance identified the projects as forward-looking and noted risks and uncertainties that could cause actual results to materially differ."); *In re Cutera Sec. Litig.*, 610 F.3d at 1112 (applying safe harbor when "conference call began with a notice that 'these prepared remarks contain forward-looking statements concerning future financial performance and guidance,' … and that factors like Cutera's 'ability to continue increasing sales performance worldwide' could cause variance in the results.").

Additionally, the day after the Q1 2021 Call, Acutus filed its Form 10-Q with the SEC. ECF No. 32-7, Ex. 3. The filing contains a further discussion of "forward-looking statements" and the relevant risk factors. The "Risk Factors" section incorporated by reference the Form 10-K filed on March 19, 2021, which addressed the risks associated with international operations, third-party suppliers, inadequate physician training, COVID-19, and market acceptance of the AcQMap System. *Id.*; ECF No. 32-5, Ex. 1. The company's SEC filings also provide meaningful cautionary language in identifying important factors that could cause actual results to differ. *See In re LeapFrog Enterprises, Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1047 (N.D. Cal. 2007) (concluding that "Risk Factors" section in forms 10–K and 10–Q was sufficient as meaningful cautionary language). Contrary to Plaintiff's argument, Defendants need not predict the specific risks that resulted in its failure to meet its business goals. *See Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 931 (N.D. Cal. 2017) ("The cautionary language given does not need to warn of the 'exact risk' that transpires and causes a company to miss a guidance forecast.").

The Court concludes that the safe harbor provision applies to Defendants' forward-looking statements discussed above.

//

//

### 3. *Opinion Statements*

The Supreme Court has distinguished a fact from a statement of opinion in the context of securities fraud cases. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015). A fact is a thing done, existing, or happening; an opinion is a belief, view, or sentiment. *Id.* at 183. "[A] statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not." *Id.* The Supreme Court explained that opinion statements can "contain embedded statements of fact," which "may be read to affirm not only the speaker's state of mind … but also an underlying fact." *Id.* at 185.

Challenging an opinion statement is "no small task for an investor." *Id.* at 194. The Ninth Circuit has identified three theories for pleading falsity of opinion statements:

> First, when a plaintiff relies on a theory of material misrepresentation, the plaintiff must allege both that "the speaker did not hold the belief she professed" and that the belief is objectively untrue.
>
> Second, when a plaintiff relies on a theory that a statement of fact contained within an opinion statement is materially misleading, the plaintiff must allege that "the supporting fact [the speaker] supplied [is] untrue."
>
> Third, when a plaintiff relies on a theory of omission, the plaintiff must allege "facts going to the basis for the issuer's opinion … whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context."

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615–16 (9th Cir. 2017) (quoting *Omnicare*, 575 U.S. at 194).

Here, Plaintiff contends that *Omnicare* "does not apply to Defendants' statements about the progress of Acutus's commercial execution or Acutus's revenue guidance." ECF No. 33 at 21. Some of the Defendants' statements at issue do contain language indicative of opinions. *See* CAC ¶ 105 ("*We are pleased with* the progress on several key strategic initiatives, including improved revenue performance and commercial execution …. In the

US, *we are encouraged to see* this part of our business gaining momentum as end-markets improve."); ¶ 111 ("Our commercial execution globally is strengthening, and *I'm confident* we have the right team in place."); ¶ 115 ("So *I think* we're on track now."); ¶ 152 ("Our commercial execution globally is strengthening, and *I am confident* we have the right team in place.") (opinion-indicative language emphasized). However, the Court has previously addressed these same statements and determined that in context, the statements were too vague to be actionable as statements of fact. Accordingly, the Court does not address the dispute between the Parties as to whether such statements are also protected under *Omnicare*.

### ***4. Omissions***

As discussed above, Plaintiff's brief focuses on a theory that Defendants made material misrepresentations about the progress of Acutus's commercial execution. *See* ECF No. 33 at 1 ("This action seeks redress for the investors of Acutus Medical, Inc., who lost millions of dollars as a result of Defendants' material misrepresentations about the progress of commercial execution for their flagship product …."). Plaintiff's theory of material omissions is the obverse: That at the time Defendants made material misrepresentations about the progress of Acutus's commercial execution, they omitted to disclose that Acutus's commercial execution was *not* making progress. *See* ECF No. 33 at 23 ("Defendants omitted material information …. Contrary to [Defendants'] representations, Acutus's commercial execution was not increasing and improving[,] and far from remediating the prior weaknesses, was deteriorating further … which was not disclosed to investors.") (citations omitted). Plaintiff alleges:

> [A]t the time of Defendants' Class Period statements and undisclosed to investors, their commercial team was understaffed and underqualified; their commercial team did not know how to and were not targeting appropriate accounts or ensuring sufficient physician training and engagement; they had placed a material number of systems at sites where physicians were unlikely to adopt and utilize the system and at sites where the Company lacked sufficient staffing and infrastructure to train physicians to utilize the systems; they had placed

> a material number of systems under "research agreements", where Acutus paid physicians per use of the system, and; as a result of these undisclosed facts, Defendants were designing a plan to remove and reposition a material percentage of the installed base.

*Id.* at 14-15. Plaintiff further alleges that Defendants "also violated Item 303 of Regulation S-K by failing to disclose Acutus's ongoing commercial execution deficiencies," and "violated Item 105 of Regulation S-K due to their insufficient risk disclosures." *Id.* at 24.

Rule 10b-5 prohibits "only misleading and untrue statements, not statements that are incomplete." *Police Ret. Sys. of St. Louis*, 759 F.3d at 1061 (quoting *Brody*, 280 F.3d at 1006)). As the Ninth Circuit has explained, "[n]o matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not." *Id.* To be actionable, an omission "must affirmatively create an impression of a state of affairs that differs in a material way from one that actually exists." *Id.*

Plaintiff's allegations of omissions fail to state a claim. The record reflects that less than two months before the beginning of the Class Period, Defendants disclosed ongoing challenges and risks associated with its commercial execution. *See supra*, section III.B.1. The purported omissions identified by Plaintiff, whether considered on their own or in connection with the purported misrepresentations, do not "affirmatively create an impression of a state of affairs that differs in a material way" from the one existing.

Nor does Plaintiff state a claim based on a violation of Regulation S-K. Item 303 requires a registrant to describe "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations," as well as "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(i)-(ii). Item 105 requires a "discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105. Plaintiff's allegations here

are cursory. As to Item 303, the Complaint alleges that Acutus's "failing commercial execution" was a "known trend or uncertainty likely to have a material impact" on Acutus's revenue, CAC ¶ 101; as to Item 105, the Complaint alleges that "Defendants' Class Period SEC filings omitted to disclose material facts" *id.* ¶ 104. These theories suffer from the same shortcomings, discussed above, as Plaintiff's theories of material misrepresentation and omission.

The Court concludes that Plaintiff has failed to adequately allege a material misrepresentation or omission, and fails to state a claim under Section 10(b) of the Exchange Act and Rule 10b-5.

**C. Scienter**

Defendants next contend that Plaintiff fails to plead a strong inference of scienter. The PSLRA "requires that the complaint 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *No. 84 Emp.-Teamster*, 320 F.3d at 931 (citing 15 U.S.C. § 78u–4(b)(2)). "To adequately demonstrate that the 'defendant acted with the required state of mind,' a complaint must 'allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness.'" *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009), *as amended* (Feb. 10, 2009) (citation omitted). "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs, Inc.*, 551 U.S. at 323. For a complaint to survive a motion to dismiss, "the inference of scienter [must be] cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. The court "conduct[s] a two-part inquiry for scienter: first, we determine whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegation is sufficient, we conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Curry v. Yelp Inc.*, 875 F.3d

1219, 1226 (9th Cir. 2017) (citing *New Mexico State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011)).

Plaintiff's allegations that Defendants knowingly misled investors or were extremely reckless are based on: (1) Defendants' motivation to raise funds; (2) the core operations doctrine; and (3) a former employee's allegations. ECF No. 33 at 25-31.

Before addressing each of these theories, the Court notes that Plaintiff's arguments on scienter suffer from a similar lack of specificity as identified above in the alleged misrepresentations. To the extent that those alleged misrepresentations are vague and generalized, it is exceedingly difficult to establish that Defendants knew the statements at issue were false. Thus, Plaintiff's discussion of scienter, ECF No. 33 at 25-33, is vague in describing the "truth" that Defendants knew. *See id.* at 25 (alleging that Defendants "knowingly misled investors or were at least extremely reckless with the truth"); *id.* at 26 (alleging that Defendants "had access to information that contradicted their positive Class Period representations"). Plaintiff's most specific allegation is that Defendants "were motivated to conceal the truth about Acutus's failing commercial execution and ability to increase Acutus's installed base," *id.* at 29, but even here, the allegation is non-specific. The generality of the alleged misrepresentations, and of the alleged evidence of scienter, renders the evaluation of Plaintiff's theories of scienter necessarily generalized as well.

### *1. Defendants' Financing Motive*

The Complaint alleges that "[d]efendants were motivated to issue materially false and misleading statements so that Acutus could raise cash at inflated levels to infuse much needed funds into the Company and provide necessary funding for the Company's commercial efforts." CAC ¶ 191. Plaintiff also argues that scienter is sufficiently alleged due to the temporal proximity between Defendants' misleading statements and the closing of the SPO in July 2021. ECF No. 33 at 30. Plaintiff does not allege insider stock sales or any other personal benefit to Defendants.

Facts showing "a motive to commit fraud and an opportunity to do so" are "not sufficient to establish a *strong* inference of deliberate recklessness." *In re Silicon Graphics*

*Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999). "[P]laintiffs must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity." *Id.* The Ninth Circuit has stated that "[g]enerally, we expect that a financial motive for securities fraud will be clear; for example, someone inside a company stands to gain a substantial profit by engaging in deceptive behavior, such as selling shares before the company discloses negative information." *Prodanova v. H.C. Wainwright & Co.*, 993 F.3d 1097, 1107 (9th Cir. 2021). The lack of a plausible motive "makes it much less likely that a plaintiff can show a strong inference of scienter." *Id.* at 1108. The Ninth Circuit has held that "[o]nly where a complaint otherwise asserts compelling and particularized facts showing fraudulent intent or deliberate recklessness will we overlook the failure to allege a plausible motive." *Id.*

Plaintiff's allegations that Acutus defrauded investors because the company was low on cash are insufficient. "[A]llegations of routine corporate objectives such as the desire to obtain good financing and expand are not, without more, sufficient to allege scienter; to hold otherwise would support a finding of scienter for any company that seeks to enhance its business prospects." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012) (citing *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002)); *see also Webb v. Solarcity Corp.*, 884 F.3d 844, 856 (9th Cir. 2018) (dismissing as not "specific" or "particularized" the plaintiffs' allegation of the defendants' "motive to boost the company's profitability and stock prices in the months surrounding the company's IPO"; "[s]urely every company that goes public wants to maintain its apparent profitability prior to its IPO and to maintain a high share price afterward in order to finance acquisitions and expand"); *In re Regulus Therapeutics Inc. Sec. Litig.*, 406 F. Supp. 3d 845, 860 (S.D. Cal. 2019) ("As to Plaintiffs' arguments concerning Regulus's debt financing activities, such routine corporate objectives are insufficient to establish a strong showing of scienter."). Similarly, Plaintiff's contention that Defendants were motivated to "keep the company afloat" and a "going concern" does not support a strong inference that Defendants were

intentional or deliberately reckless. To find otherwise would be to infer scienter for any company not in a strong financial position.

Additionally, Plaintiff's theory of Defendants' motivations is not persuasive. As Defendants argue, "plaintiff's allegations that Acutus misrepresented its commercial team's ability to meet its quarterly installation goals ignores that, each quarter, Acutus would report its installed base on AcQMap consoles." ECF No. 32-1 at 30-31. Plaintiff offers no plausible reason why Acutus would misrepresent its future expected installations when its actual installations were regularly and accurately reported to the public. In *Nguyen v. Endologix, Inc.*, the plaintiffs alleged that the defendants made false and misleading statements about whether the FDA was likely to approve the defendants' product, while knowing that the FDA would not do so. 962 F.3d at 415. The Ninth Circuit observed that the plaintiffs' "theory does not make a whole lot of sense. It depends on the supposition that defendants would rather keep the stock price high for a time and then face the inevitable fallout once [the product's] 'unsolvable' migration problem was revealed." *Id.* The court offered that the theory "might have more legs" if "defendants had sought to profit from this scheme in the interim, such as by selling off their stock or selling the company at a premium"; but instead, "we are asked to accept the theory that defendants were promising FDA approval for a medical device application they knew was 'unapprovable,' misleading the market all the way up to the point that defendants were 'unable to avoid the inevitable.'" *Id.* Plaintiff's allegation here, too, fails to "resonate in common experience." *Id.*

### 2. *Core Operations Doctrine*

Plaintiff argues that the "core operations doctrine" supports a strong inference of scienter. The core operations theory "relies on the principle that 'corporate officers have knowledge of the critical core operation of their companies.'" *Police Ret. Sys. of St. Louis*, 759 F.3d at 1062. There are three circumstances in which a plaintiff's core operations allegations may support a strong inference of scienter:

> (1) [W]hen they, along with other allegations, support a cogent and compelling inference of scienter, (2) when they are themselves

> particular and suggest that the defendants had actual access to the disputed information, and (3) in the "rare circumstances" when they are not particularized, but "the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter."

*Prodanova*, 993 F.3d at 1111 (quoting *Police Ret. Sys. of St. Louis*, 759 F.3d at 1062).

Plaintiff asserts that the doctrine applies here because Defendants had previously made statements about Acutus's commercial execution and its AcQMap placements, establishing their access to information that "contradict[ed]" the fraud. ECF No. 33 at 25-26. Further, Plaintiff contends that the size of the commercial organization (88 individuals), and the importance of the AcQMap installed base to Acutus's business, support the inference that the Individual Defendants had actual knowledge of the fraud. *Id*. at 27-28.

The Complaint does not support any of these three circumstances in which the core operations doctrine applies. The general importance of the AcQMap installed base to Acutus's business does not establish that Defendants were aware of particular information relating to the each of its installations and the hiring and training of its staff. *See In re AnaptysBio, Inc.*, No. 20-CV-565 TWR (DEB), 2021 WL 4267413, at *14 (S.D. Cal. Sept. 20, 2021) ("[M]erely emphasizing the importance of [a drug] to the Company does not show that the core operations theory applies"); *Gammel v. Hewlett-Packard Co.*, 905 F. Supp. 2d 1052, 1078 (C.D. Cal. 2012) ("[I]t does not automatically follow from the 'core' nature of HP's PC and printer businesses or the anticipated volume of webOS sales that each Individual Defendant was immediately aware of developments in HP's webOS strategy.").

Plaintiff identifies statements by Burgess suggesting his access to information that contradicted his public statements. *See* CAC ¶ 54 ("[I]t is my view that there are other execution factors at play here, primarily related to inadequate targeting, physician segmentation and proper training and direction of our commercial team. I take full responsibility for this."); *Id.* ¶ 58 ("Importantly, many of the new system placements so far in 2021 are at major academic and high-volume community institutions, consistent with

our strategy to be more targeted[.]"). However, these general statements indicate Defendants' high-level understanding of the company's position, not detailed involvement or exposure indicative of scienter. *See Police Ret. Sys. of St. Louis*, 759 F.3d at 1062 ("A plaintiff must produce either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring . . . or witness accounts demonstrating that executives had actual involvement in creating false reports."). Further, even if Defendants did have the detailed knowledge that Plaintiff suggests, Plaintiff's allegations do not support the contention that Defendants had actual knowledge that their future projections or other statements were inaccurate at the time they were made. *See id.* (distinguishing between mere inference of knowledge of core operations and scienter); *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1068 (9th Cir. 2008) ("[C]orporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud.").

Instead, taking into account other plausible opposing inferences, Plaintiff's allegations appear to support the innocent inference that Defendants genuinely believed they could achieve their goals. *See City of Royal Oak Ret. Sys.*, 880 F. Supp. 2d at 1070 (finding that plaintiff failed to plead a strong inference of scienter when the alleged facts instead support a competing innocent inference); *Berson*, 527 F.3d at 989 ("Where defendants make cheerful predictions that do not come to pass, plaintiffs may not argue, based only on defendants' prominent positions in the company, that they ought to have known better…. [T]he PSLRA requires 'particular allegations which strongly imply Defendant[s'] *contemporaneous* knowledge that the statement was false when made.'"). Additionally, Defendants' statements consistently cite the role that COVID-related restrictions, and the easing or tightening of those restrictions, played in the demand for the company's product, and in the access that the company's commercial team had to physicians and hospitals. Plaintiff dismisses this issue as a "red herring" and states that the

Court is obliged to treat Defendants' position as untrue. ECF No. 33 at 24 n.13. But in determining on a motion to dismiss whether Plaintiff has pleaded a "strong inference" of scienter, the Court is obliged to consider opposing inferences as well. *Tellabs, Inc.*, 551 U.S. at 324. Plaintiff has not raised an inference of scienter that is "at least as compelling" as any opposing inference. *Id.*

Finally, this does not constitute the "rare circumstance" in which it would be "absurd" for Defendants to lack knowledge of the problems facing Acutus. There are no other indicia of scienter here. *See Mauss v. Nuvasive, Inc.*, No. 13cv2005 JM (JLB), 2015 WL 10857519, at *13 (S.D. Cal. Aug. 28, 2015) (finding the "absurdity" application of the core operations doctrine did not apply in the absence of any "red flags" of alleged illegalities). The Court concludes that the core operations doctrine does not apply to establish a strong inference of scienter.

***3. Former Employee***

Plaintiff also offers, as evidence of scienter, allegations from a Former Employee who worked as a Senior Therapy Manager for Acutus between 2019 and 2022. CAC ¶ 45. Plaintiff alleges the Former Employee stated that Acutus placed AcQMap systems pursuant to "research agreements" that paid physicians to use the system. *Id*. Plaintiff alleges that based on the Former Employee's experience, the paid research agreements between Acutus and physicians did not encourage adoption of the AcQMap systems because physicians would open the system to collect the fee, but then use a competitor's system to conduct the actual procedure. *Id.* ¶¶ 48-49.

To rely on a confidential witness's statements to establish scienter, "(1) the confidential witnesses … must be described with sufficient particularity to establish their reliability and personal knowledge; and (2) those statements which are reported … must themselves be indicative of scienter." *Ferreira v. Funko Inc.*, No. LACV 20-02319-VAP (PJWx), 2021 WL 880400, at *26 (C.D. Cal. Feb. 25, 2021) (citations and quotations omitted). In order for witness declarations to support an inference of scienter, "they must provide specific facts showing a connection between the false statement and the mindset

of the person who made it." *Prodanova*, 993 F.3d at 1110 (citing *Zucco Partners, LLC*, 552 F.3d at 996).

Here, Plaintiff fails to make this connection. The Complaint does not allege that the Former Employee directly worked with, spoke to, or otherwise interacted with Defendants. *See Police Ret. Sys. of St. Louis*, 759 F.3d at 1062-63 (finding that the complaint did not support a strong inference of scienter when it pointed to witnesses who "lacked direct access to the executives" and omitted the "link between the witnesses and the executives"); *Jun Shi v. Ampio Pharms., Inc.*, No. 2:18-cv-07476-RGK-RAO, 2020 WL 5092910, at *6 (C.D. Cal. June 19, 2020) (declining to find a strong inference of scienter in part because "[t]here are no particularized allegations that any of these confidential witnesses communicated concerns … to Defendants"); *cf. In re Fibrogen, Inc.*, No. 21-CV-02623-EMC, 2022 WL 2793032, at *22 (N.D. Cal. July 15, 2022) (finding that witness had personal knowledge from direct interaction with senior officer by attending boardroom meetings in which senior officer presented data). Plaintiff's allegations about the Former Employee do not establish a strong inference of scienter.

Considering the Complaint's allegations individually and holistically, the Court concludes that Plaintiff has not established a strong inference of scienter. Plaintiff thereby fails to state a claim under Section 10(b) of the Exchange Act and Rule 10b-5.

**D. Loss Causation**

Defendants lastly argue that Plaintiff fails to plead loss causation. The Complaint includes a section entitled "Loss Causation," which contains three paragraphs. CAC ¶¶ 173-175. Plaintiff alleges that "Defendants made materially false and/or misleading statements and/or omissions" and that this "wrongful conduct caused the price of Acutus securities to be artificially inflated." *Id.* ¶ 174. Plaintiff further alleges that "the truth regarding the Company's failed commercial strategy was partially revealed, and/or the concealed risks materialized, on August 12, 2021 and November 11, 2021." *Id.* ¶ 175. Thus, Plaintiff alleges as a "direct result … Acutus's stock declined significantly" and resulted in economic losses and damages for Plaintiff and investors. *Id.*

To establish loss causation, "the plaintiff must show that after purchasing her shares and before selling, the following occurred: (1) 'the truth became known,' and (2) the revelation caused the fraud-induced inflation in the stock's price to be reduced or eliminated." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 789 (9th Cir. 2020) (quoting *Dura Pharms.*, 544 U.S. at 347). The "most common way" for plaintiffs to prove that "the truth became known" is to identify one or more corrective disclosures. *Id.* at 790. Corrective disclosures can be in the form of "news or announcements to investors that revealed the company's prior misstatements to have been false or misleading." *3226701 Canada, Inc. v. Qualcomm, Inc.*, No. 15cv2678-MMA (WVG), 2017 WL 4759021, at *11 (S.D. Cal. Oct. 20, 2017), *aff'd on other grounds sub nom. Pub. Emps. Ret. Sys. of Mississippi v. Qualcomm, Inc.*, 773 F. App'x 987 (9th Cir. 2019).

The Complaint fails to specify what "truth regarding the Company's failed commercial strategy" was revealed. CAC ¶ 175. In his Opposition, Plaintiff contends that the new information consisted of: (1) Defendants' August 11, 2021 disclosure that the company would "probably" need to remove and reposition "some" systems, and (2) Defendants' November 11, 2021 disclosure that the company did remove and reposition a "meaningful" number of systems. ECF No. 33 at 34.

Plaintiff's general allegations fail to establish loss causation. As the Ninth Circuit stated in *In re Oracle Corp. Securities Litigation*, "loss causation is not adequately pled unless a plaintiff alleges that the market learned of and reacted to the practices the plaintiff contends are fraudulent, as opposed to merely reports of the defendant's poor financial health generally…. Loss causation requires more than an earnings miss." 627 F.3d 376, 392 (9th Cir. 2010). Here, Plaintiff's allegations do not reveal any fraudulent practices by Defendants. Rather, Defendants stated that they needed to, and that they did, reposition AcQMap systems. The statements at issue did not correct prior statements by Defendants that no system repositioning would ever again be needed. Quite the opposite. Before the Class Period began, Defendants had disclosed ongoing challenges in ensuring that systems were placed correctly. *See* ECF No. 32-13, Ex. 9 at 6 ("[W]e have been slow with the

initiation of some of our installs and struggle to drive uptake and consistent utilization."); *id.* at 10 ("[W]e've got to make sure that these systems that get placed are placed into the hands of physicians and teams at hospitals that are deeply committed to … really working with us …."); *see also Fitbit*, 2020 WL 1465932, at *12 (citation omitted) ("Because Defendants had already disclosed the flattening demand which served as the basis for these results, the press release 'added no new information' to the market which was 'publicly revealed for the first time.'").

Plaintiff's allegation of the revelation of a "failed commercial strategy," *see* CAC ¶ 175, does not amount to correction of a fraud; and Plaintiff has not adequately connected the decline in stock price to such a correction. *See Brown v. Ambow Educ. Holding Ltd.*, No. CV 12-5062 PSG (AJWx), 2014 WL 523166, at *7 (C.D. Cal. Feb. 6, 2014) ("[W]hile these announcements may have had a negative effect on Ambow stock, they did not have a corrective effect on any prior misrepresentation."); *In re Nuveen Funds/City of Alameda Sec. Litig.*, No. C 08-4575 SI, 2011 WL 1842819, at *10 (N.D. Cal. May 16, 2011), *aff'd sub nom. Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111 (9th Cir. 2013) (finding plaintiff did not adequately plead loss causation when disclosure did not "relate back to" misrepresentation, but merely revealed negative information about how the system was performing).

Plaintiff fails to adequately plead loss causation, and thereby fails to state a claim under Section 10(b) of the Exchange Act and Rule 10b-5.

### E. Section 20(a) of the Exchange Act

Because the Court concludes that Plaintiff fails to state a claim under Section 10(b), Plaintiff's Section 20(a) claim also fails. *See Zucco Partners, LLC*, 552 F.3d at 990 ("Section 20(a) claims may be dismissed summarily … if a plaintiff fails to adequately plead a primary violation of section 10(b).").

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED**. Plaintiff may file a Second Amended Consolidated Class Action Complaint within twenty-one (21)

days from the date of this Order. If Plaintiff files an amended complaint, Defendants shall file a response to the amended complaint within twenty-one (21) days from the filing of the amended complaint. If Plaintiff does not file an amended complaint by the deadline, the case will be closed.

**IT IS SO ORDERED**.

Dated: September 27, 2023

Hon. Robert S. Huie
United States District Judge